# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION
### 09 cv 411

NORTH CAROLINA GROWERS'
ASSOCIATION, INC.,
P.O. Box 417, Vass, NC 28394, and

NATIONAL CHRISTMAS TREE ASSOCIATION,
16020 Swingley Ridge Road, Suite 300
Chesterfield, MO 63017, and

FLORIDA FRUIT & VEGETABLE
ASSOCIATION, INC.,
800 Trafalgar Ct., Suite 200
Maitland, FL 32794-8153, and

VIRGINIA AGRICULTURAL GROWERS
ASSOCIATION, INC.,
P.O. Box 857, South Boston, VA 24592, and

SNAKE RIVER FARMERS ASSOCIATION,
P.O. Box 807
Heyburn, ID 83336, and

NATIONAL COUNCIL OF AGRICULTURAL
EMPLOYERS,
1112 16th St. NW, Suite 920
Washington, DC 20036, and

NORTH CAROLINA CHRISTMAS
TREE ASSOCIATION,
P.O. Box 1937
Boone, NC 28607, and

NORTH CAROLINA PICKLE PRODUCERS
ASSOCIATION,
P.O. Box 8333
Wilson, NC 27893-1333, and

FLORIDA CITRUS MUTUAL,
P.O. Box 89
Lakeland, FL 33802, and

NORTH CAROLINA AGRIBUSINESS COUNCIL, INC.,

2500 Regency Parkway
Cary, North Carolina 27518, and

MAINE FOREST PRODUCTS
COUNCIL,
535 Civic Center Drive,
Augusta, ME 04330, and

ALTA CITRUS, LLC
1110 W. Bell St.
Avon Park, FL 33826, and

EVERGLADES HARVESTING & HAULING, INC.,
1331 Commerce Drive
LaBelle, FL 33935, and

DESOTO FRUIT AND HARVESTING, INC.,
P.O. Box 3106
Arcadia, FL 34265, and

FOREST RESOURCES ASSOCIATION,
600 Jefferson Plaza, Suite 350
Rockville, MD 20852, and

TITAN PEACH FARMS, INC.,
No. 5, R. W. DuBose Road
Ridge Spring, SC 29129, and

H-2A USA, INC.,
5425 Elvis Presley Blvd., Suite B
Memphis, TN 38116, and

OVERLOOK HARVESTING COMPANY, LLC
P.O. Box 9516
Winter Haven, FL 33883,

      Plaintiffs,

v.

HILDA L. SOLIS,
in her official capacity as
United States Secretary of Labor,
200 Constitution Avenue, NW,
Washington, DC 20210, and

2

THE UNITED STATES DEPARTMENT
OF LABOR, 200 Constitution Avenue,
NW, Washington, DC 20210, and

JANET NAPOLITANO,
in her official capacity as
United States Secretary of Homeland Security,
Washington, DC 20528, and

THE UNITED STATES DEPARTMENT
OF HOMELAND SECURITY,
Washington, DC 20528,

      Defendants.

## COMPLAINT

Plaintiffs the North Carolina Growers' Association, Inc., the National Christmas Tree Association, the Florida Fruit & Vegetable Association, Inc., the Virginia Agricultural Growers Association, Inc., the Snake River Farmers Association, the National Council of Agricultural Employers, the North Carolina Christmas Tree Association, Inc., the North Carolina Pickle Producers Association, Inc., Florida Citrus Mutual, the North Carolina Agribusiness Council, Inc., the Maine Forest Products Council, ALTA Citrus, LLC, Everglades Harvesting & Hauling, Inc., DeSoto Fruit & Harvesting, Inc., Forest Resources Association, Titan Peach Farms, Inc., H-2A USA, Inc., and Overlook Harvesting Company, LLC, hereby bring this Complaint against Defendants Hilda L. Solis, in her official capacity as Secretary of the U.S. Department of Labor, the U.S. Department of Labor, Janet Napolitano, in her official capacity as Secretary of the U.S. Department of Homeland Security, and the U.S. Department of Homeland Security, alleging as follows:

3

## INTRODUCTION

1. The Plaintiffs bring this action for declaratory and injunctive relief related to *Temporary Employment of H-2A Aliens in the United States,* 74 Fed. Reg. 25972 (May 29, 2009) ("the Solis Final Rule"); *Temporary Employment of H-2A Aliens in the United States; Proposed Rule*, 74 Fed. Reg. 11408 (March 17, 2009) ("the Solis NPRM"); and *Withdrawal of Interpretation of the Fair Labor Standards Act Concerning Relocation Expenses Incurred by H-2A and H-2B Workers*, 74 Fed. Reg. 13261 (March 26, 2009) ("the Withdrawal"). The Solis Final Rule entirely rewrites a valid H-2A rule promulgated by the DOL under former Secretary Elaine L. Chao, *Temporary Agricultural Employment of H-2A Aliens in the United States: Modernizing the Certification Process and Enforcement Final Rule*, 73 Fed. Reg. 77110 (December 18, 2008) ("the Chao Final Rule"). The Chao Final Rule, which took effect January 17, 2009, in turn replaced an H-2A rule, the major provisions of which were promulgated by the DOL in 1987 ("the 1987 Rule"). The Plaintiffs contend that the Solis Final Rule and the Withdrawal should be enjoined and declared to be in violation of the Administrative Procedure Act, 5 U.S.C. §701, *et seq.* ("APA"). In the alternative to enjoining the Withdrawal, the Plaintiffs seek a declaratory judgment that contracts and understandings entered into between farmers and H-2A workers and approved by the DOL between January 17, 2009, and March 26, 2009, are valid and in compliance with the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.,* and all other applicable laws and may be complied with as written.

4

## JURISDICTION AND VENUE

2. This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, as this action involves judicial review of agency action pursuant to the APA, 5 U.S.C. §§553 and 701, *et seq.*

3. Venue is proper in the Middle District of North Carolina because Plaintiff NCGA is a citizen of North Carolina and its principal place of business is located in the Middle District of North Carolina. 28 U.S.C. §1391(e)(3).

## PARTIES

4. Plaintiff the North Carolina Growers' Association, Inc. ("NCGA") is a non-profit growers' association based in Vass, Moore County, North Carolina. NCGA is the nation's largest provider of H-2A workers, providing approximately 7,500 workers per year to approximately 700 farmers. NCGA is a North Carolina corporation.

5. Plaintiff National Christmas Tree Association ("NCTA") is a non-profit national trade association representing the Christmas tree industry. It represents 1,100 active members, 29 state and regional associations and 4,000 affiliated small and family businesses that grow and sell Christmas trees and provide related supplies and services. It is estimated that those affiliated with the national organization produce roughly three quarters of the farm-raised Christmas trees in the United States. Many of NCTA's members employ H-2A workers.

6. Plaintiff Florida Fruit & Vegetable Association, Inc. ("FFVA"), is a non-profit agricultural trade association representing producers, packers and shippers of fresh fruits, vegetables and sugarcane in the state of Florida, including employers of H-2A

workers. FFVA is a Florida corporation, and its principal place of business is Maitland, Florida.

7.     Plaintiff the Virginia Agricultural Growers Association, Inc. ("VAGA") is a nonprofit agricultural association, organized under the laws of the Commonwealth of Virginia, that is authorized under 8 U.S.C. § 1188(d) to file master job orders as a joint employer with and on behalf of its grower members. In 2008, VAGA's 246 members obtained nearly 1,300 H-2A workers.

8.     Plaintiff Snake River Farmers Association ("Snake River"), is a for-profit agent that provides H-2A workers to agricultural employers. Snake River's principal place of business is Heyburn, Idaho.

9.     Plaintiff the National Council of Agricultural Employers ("NCAE") is a non-profit agricultural association organized under Section 501(c)(6) and based in Washington, D.C. Some of NCAE's members employ H-2A workers.

10.    Plaintiff North Carolina Christmas Tree Association ("NCCTA") is an association of Christmas tree growers in the state of North Carolina, many of whom employ H-2A workers. NCCTA's principal place of business is Boone, North Carolina.

11.    Plaintiff North Carolina Pickle Producer Association ("NCPPA") is a non-profit association of pickle cucumber growers and seed companies, and pickle shippers and packers. Some of the NCPPA's grower members employ H-2A workers. NCPPA is a North Carolina corporation with its principal place of business in Nashville, North Carolina.

6

12.     Plaintiff Florida Citrus Mutual ("FCM") is a Section 501(c)(6) non-profit citrus trade association whose members include employers of H-2A workers. FCM's headquarters is in Lakeland, Florida.

13.     Plaintiff the North Carolina Agribusiness Council, Inc. ("NCAgC"), is a non-profit corporation that raises awareness of the North Carolina agriculture and its contribution to the state economy, and advances agribusiness interests and programs. NCAgC is a North Carolina corporation with its principal place of business in Cary, North Carolina.

14.     Plaintiff Maine Forest Products Council ("MFPC") is an association of forest products industry members in the State of Maine, many of whom employ non-immigrant alien laborers. MFPC's membership includes forest landowners, land managers, logging contractors and wood-using mills. MFPC's principal place of business is Augusta, Maine.

15.     Plaintiff ALTA Citrus, LLC ("ALTA"), is a for-profit citrus harvester that employs H-2A workers. ALTA's principal place of business is Avon Park, Florida.

16.     Plaintiff Everglades Harvesting and Hauling, Inc. ("Everglades") is a for-profit corporation engaged in the business of citrus harvesting, hauling, and caretaking. The principal place of business of Everglades is LaBelle, Florida.

17.     Plaintiff DeSoto Fruit and Harvesting, Inc. ("DeSoto") is a for-profit corporation engaged in the business of citrus harvesting. The principal place of business of DeSoto is Arcadia, Florida.

18.     Plaintiff Forest Resources Association ("FRA") is an association of forest products industry members, many of whom employ non-immigrant alien laborers. FRA's

7

membership includes forest landowners, land managers, logging contractors and wood-using mills. FRA's principal place of business is Rockville, Maryland.

19.     Plaintiff Titan Peach Farms, Inc. ("Titan"), is a for-profit peach grower that employs H-2A workers. Titan has operations in Edgefield, Aiken, and Saluda counties, South Carolina. Titan is a South Carolina corporation with its principal place of business in Ridge Spring, South Carolina.

20.     Plaintiff H-2A USA, Inc., is a for-profit agent that provides H-2A workers to agricultural employers and also employs H-2A workers. Its principal place of business is Memphis, Tennessee.

21.     Plaintiff Overlook Harvesting Company, LLC ("Overlook") is a for-profit limited liability corporation engaged in the business of citrus harvesting. Overlook employs H-2A workers and its principal place of business is Winter Park, Florida.

22.     Defendant Hilda L. Solis ("Solis") is Secretary of the U.S. Department of Labor. The Secretary of Labor is responsible for all functions of the DOL, including administration of the H-2A program. Solis is sued in her official capacity, pursuant to 5 U.S.C. §703.

23.     Defendant DOL is responsible for administration of the H-2A program.

24.     Defendant Janet Napolitano ("Napolitano") is Secretary of the U.S. Department of Homeland Security. The Secretary of Homeland Security is responsible for all functions of DHS and its component organizations, including approving employer petitions for H-2A workers. Napolitano is sued in her official capacity, pursuant to 5 U.S.C. §703.

8

25.     Defendant DHS is responsible for certifying petitions so that foreign workers can obtain visas to work in the H-2A and H-2B programs.

## FACTS

### *Overview of the H-2A Program*

26.     The H-2A program replaced the prior H-2 program that had also provided a legal means by which agricultural employers could obtain the temporary services of foreign agricultural workers when U.S. workers were unavailable. The H-2A program was instituted in 1987 after the enactment of the Immigration Reform and Control Act ("IRCA") amendments to the Immigration and Nationality Act, 8 U.S.C. §1101, *et seq.* ("INA"). The name "H-2A" comes from the statutory provision that creates the program, 8 U.S.C. §1101(a)(15)(H)(ii)(a). The purpose of the program was to provide non-immigrant alien labor for agricultural concerns ("farmers") in the United States. Under the program, farmers must apply to the DOL (as well as DHS and the State Department) and be approved to hire H-2A workers. The farmers must meet a number of stringent regulatory requirements regarding the wages paid, reimbursing or furnishing of certain transportation expenses, furnishing of housing, and the like. All of these terms are set forth in a contract (Agricultural and Food Processing Clearance Order, or "Clearance Order") that must be approved by DOL and is provided to the H-2A worker. The H-2A program was not designed to replace U.S. farm workers with H-2A workers: as a prelude to hiring an H-2A worker, farmers must make concrete efforts to find qualified U.S. workers and, among other requirements, offer a specified wage that is designed to ensure that U.S. workers' wages are not adversely affected by the use of H-2A workers (typically by paying the "Adverse Effect Wage Rate" ("AEWR")). Before an employer

9

can proceed to hire H-2A workers, the DOL must first certify that there are insufficient U.S. workers available and that the employer's use of H-2A workers will not adversely affect the wages and working conditions of similarly situated U.S. workers. *See* 8 U.S.C. § 1188(a)(1)(A), (B). The H-2A program also guarantees to workers employment contracts, certain benefits including free housing, and other rights. For the farmers, the H-2A program creates access to legally authorized employees for their farms and provides some stability and security to the employment relationship.

27.     Farmers are required by regulation to file H-2A applications no fewer than 45 days before the date they expect to need H-2A workers. Generally, farmers wait until very near the minimum 45-day filing requirement, in order to better evaluate prevailing weather conditions, crop conditions, labor availability, confirm necessary transplant and other input availability, and other factors. The DOL is required by statute to, in most cases, render a decision on an H-2A application no fewer than 30 days before the employer's date of need, 8 U.S.C. §1188(c)(3)(A), so that additional processes can be completed, including, for example, the filing and processing of a petition based on the DOL certification with the United States Citizenship and Immigration Services of the Department of Homeland Security and so that workers can obtain visas, typically in their home countries.

28.     Before promulgation of the Chao Final Rule, the H-2A program had historically been plagued by severe processing and administration problems and criticized by both workers and farmers for its inefficiencies, although it does provide the only legal avenue to hire foreign agricultural workers when there insufficient numbers of U.S. workers available. One criticism of the 1987 Rule from the standpoint of farmers  was

10

that some of the requirements and processes were so cumbersome and prone to severe delay that they actually had the perverse effect of discouraging farmers from participating in the H-2A program. *See, e.g.*, U.S. General Accounting Office Report to Congressional Committees, *H-2A Agricultural Guestworker Program* (December 1997); *see also* Notice of Proposed Rulemaking, *Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement; Proposed Rule*, 73 Fed. Reg. 8538, 8541-42 (Feb. 13, 2008) ("Chao NPRM"); Chao Final Rule, 74 Fed. Reg. 77111 (Dec. 18, 2008). NCGA has been requesting changes to the 1987 H-2A regulations since 1991.

**The "Chao Final Rule"**

29.     In August 2007, the Bush White House announced that the DOL would review the H-2A program and consider proposing changes to the program regulations. Even before the DOL formally proposed changes through the Chao NPRM, farmers, agricultural associations and farmworker advocates provided the DOL with suggestions for reforms to the H-2A regulations. .

30.     After approximately six months of receiving such suggestions, on February 13, 2008, then-Secretary of Labor Elaine L. Chao issued the Chao NPRM, which proposed a "re-engineering" of the existing H-2A regulations. *See* 73 Fed. Reg. 8538. Among other changes, former Secretary Chao proposed a modernized process by which farmers could apply for H-2A workers, including elimination of the duplication of efforts by the DOL and State Workforce Agencies ("SWAs"), a more accurate and precise method of setting Adverse Effective Wage Rates ("AEWRs"), increased protections for workers, and clarification regarding reimbursement of workers' inbound

11

transportation and related expenses. The comment period was open for 60 days, and the DOL received approximately 11,000 comments from farmers, agricultural associations, state labor agencies, academics, farmworker unions and advocacy organizations. On December 18, 2008, and after more than six additional months of deliberation, the DOL promulgated the Chao Final Rule, which became effective on January 17, 2009.

31. From the standpoint of H-2A farmers, the Chao Final Rule contained a number of welcome improvements over the 1987 Rule. The H-2A application process is streamlined, removing the burdens of duplicative filing requirements and a tedious, time-consuming approval (or denial) process. The Chao Final Rule also clarified issues related to reimbursement of travel expenses, calculation of the applicable wage rate, handling of workers' compensation benefits when the H-2A requirement appears to conflict with applicable state law, ensured additional due process rights for applicants, improved worker protections, and many other issues, providing much-needed legal certainty to both farmers and workers. Finally, the Chao Final Rule also provided that logging guestworkers, and employees of certain agricultural packing house operations, previously included in the "H-2B non-agricultural" program, would henceforth be included in the H-2A program.

32. The Chao Final Rule was issued about the same time that farmers began their financial and business planning for the current year. Many of the Plaintiffs and other farmers procured loans (using their homes, farmland, and equipment as collateral) and made other business commitments for the 2009 season based in substantial part on the substantive provisions of the Chao Final Rule, including its lower compliance costs, of which labor costs make up a significant portion. In many cases, business decisions had

12

been finalized, crops had been planted, labor needs had been set and other irreversible commitments had been made before Secretary Solis formally proposed rewriting the Chao Final Rule.

### The *Arriaga* Theory and the Withdrawal

33.     Before the Chao Final Rule was promulgated, farmers were subject to a number of "*ex post facto*" class and collective action lawsuits alleging that the farmers violated the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA"), by failing to reimburse inbound transportation and other travel-related expenses when they paid H-2A workers their first workweeks' wages ("relocation expenses"). In fact, these farmers relied on the DOL H-2A regulations and other principles under the FLSA to calculate H-2A workers' wages. The H-2A regulations specifically provided that relocation expenses did not have to be reimbursed until the worker completed 50 percent of the contract period ("the Reimbursement Rule"). 29 C.F.R. §655.102(b)(5). Worker advocates, however, have generally been successful in these lawsuits, costing farmers millions of dollars in unanticipated liability. *See, e.g., Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228 (11th Cir. 2002). Plaintiff NCGA and its members were also defendants in one of these lawsuits. *See DeLuna-Guererro v. The North Carolina Growers' Ass'n,* 370 F. Supp.2d 386 (E.D.N.C. 2005). These and some other courts have found that relocation expenses are "primarily for the benefit of the employer" within the meaning of the §203(m) of the FLSA, and as such must be considered "*de facto* deductions" from wages if not reimbursed when the workers receive wages for their first workweek, to the extent that the costs "cut into" the workers' FLSA Section 6 minimum wages for that week. These court decisions are contrary to what the

13

DOL says in the Reimbursement Rule and other principles that govern FLSA analysis. If the "*de facto* deductions" take the workers below the FLSA minimum wage, then the farmers may have violated the FLSA, according to this theory ("the *Arriaga* theory"). If the "*de facto* deductions" take the workers below an AEWR that is higher than the minimum wage, then the theory says that the farmers may still have breached the terms of their Clearance Orders and may have violated applicable state wage payment laws.

34.     The Preamble to the Chao Final Rule (and the H-2B Final Rule issued one day later) clarified this issue, seemingly, once and for all. The Preamble rejected the *Arriaga* theory and explained that these relocation expenses are not "primarily for the benefit of the employer." Therefore, consistent with the H-2A regulations, the expenses do not have to be reimbursed when wages are paid for the first workweek. The Preamble's discussion of this issue contained a detailed legal analysis of the DOL's interpretation of the requirements of the FLSA (which is enforced by the Administrator of the Wage Hour Division of DOL and who was an issuer of the Chao Final Rule). *See* 73 Fed. Reg. 77148-51; see also *Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes; Final Rule*, 73 Fed. Reg. 78020, 78039-41 (Dec. 19, 2008).

35.     As a result of this explanation of applicable law in the Chao Final Rule, farmers who applied for H-2A workers between January 17, 2009, and March 26, 2009, included in their Clearance Orders statements that they would not reimburse relocation expenses when paying employees for their first workweek. The DOL approved most of these Clearance Orders, and many, if not most, of the Clearance Orders have already

14

been executed. Accordingly, many of the 2009 H-2A workers have already started work in the United States and were not reimbursed for relocation expenses when they were paid for their first workweek.

36.     The Withdrawal issued on March 26, 2009, purports to withdraw the Chao Final Rule Interpretation and H-2B Final Rule Interpretation that explains why the *Arriaga* theory is an incorrect statement of FLSA Section 6 minimum wage requirements. *See* 74 Fed. Reg. 13261. Although the Chao Final Rule included a detailed reasoned analysis and was issued only after notice and an opportunity for public comment, the Withdrawal contained no reasoned analysis of the DOL's reversal on the *Arriaga* issue and was issued without notice and an opportunity for public comment. These procedural defects render the Withdrawal invalid.

37.     The Withdrawal would presumably put farmers who applied for H-2A workers between January 17, 2009, and March 26, 2009, and whose workers have begun work in potential violation of the Section 6 minimum wage provisions of the FLSA and in breach of applicable state wage payment laws even though their Clearance Orders and reimbursement practices were in compliance with the law at the time undertaken.

38.     Accordingly, the Plaintiffs request that the DOL be temporarily restrained, and preliminarily and permanently enjoined, from giving effect to the Withdrawal. In the alternative, the Plaintiffs seek a declaratory judgment that Clearance Orders approved by the DOL and entered into between the farmers and H-2A workers between January 17, 2009, and March 26, 2009, are in compliance with the FLSA and all other applicable laws, valid, and enforceable as written, and that they will not be liable under an *Arriaga*

15

theory for failure to reimburse relocation expenses when workers were paid for their first workweeks.

***Christmas Tree Farmers***

39.     The Chao Final Rule provided that Christmas tree farmers were "agricultural" employers and therefore exempt from the overtime requirements of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA"), §203(f). The Chao Final Rule abrogated prior opinion letters and interpretive guidance from the DOL expressing the opinion that Christmas tree farming was "forestry," which is not normally exempt, rather than "agriculture," which is exempt. The Solis Final Rule abrogates the Chao Final Rule on this issue and directly contradicts a decision from the U.S. Court of Appeals for the Fourth Circuit in the case of *U.S. Dep't of Labor v. N.C. Growers Ass'n, Inc.,* , 377 F.3d 345 (4th Cir. 2004), which found that the DOL's pre-Chao position conflicted with the clear language of the FLSA and therefore failed to meet the requirements for deference under *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944). Upon information and belief, no other court has ruled on this issue; therefore, presumably the Fourth Circuit's determination of the FLSA meaning of "agriculture" will apply in North Carolina, South Carolina, Virginia, West Virginia, and Maryland, and the rest of the nation will be governed by a different standard as a result of the Solis Final Rule. This will cause inconsistency and confusion, particularly with Christmas tree farmers who operate in multiple states, and will deny farmers in other jurisdictions the rights confirmed by the Chao Final Rule.

40.     In addition, the Solis NPRM did not provide any specific reason why the Chao Final Rule as it related to Christmas tree farming should be abrogated. There is no

16

nexus between the alleged problems relating to the Chao Final Rule (such as processing delays and "sequence of operational events") and whether Christmas tree farming is "agriculture" or "forestry" within the meaning of the FLSA. Although the Preamble to the Solis Final Rule acknowledges that the DOL received comments on the lack of nexus and even admitted that there was no such nexus, the Preamble to the Solis Final Rule said for the first time that it was reverting to the DOL's 1950's position because it wanted to examine the effect of the Chao Final Rule on minimum wage and child labor violations, and the impact of the Chao Final Rule on low-wage earners. Because these "rationales" were not in the Solis NPRM, the public had no notice or opportunity to comment. Moreover, from a substantive standpoint, the Solis Final Rule on Christmas tree farming is invalid and not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed.2d 694 (1984), because it conflicts with the clear statutory language of §203(f) of the FLSA.

***The Forest Products Industry***

41.　　The Chao Final Rule provided that logging guestworkers would be subject to the H-2A program. The forest products industry in the northeastern United States (which includes logging as well as "downstream" industries that use lumber and wood pulp products) is highly dependent on seasonal non-immigrant, primarily French Canadian, guestworkers to harvest and transport forest products to consuming mills. Before the Chao Rule took effect, logging guestworkers were admitted under the H-2B program. The number of H-2B visas available for foreign workers to be admitted to work in the United States each year is subject to a federally mandated "cap." In years past, Congress has exempted returning H-2B workers from the cap; however, that exemption

17

provision expired, and during the summer 2008 harvest season, more than 600 Canadian loggers were denied re-entry into the United States because Congress had failed to extend the exemption and there were an insufficient number of visas to meet demand. As a result, the forest products industry suffered a severe labor shortage and lost revenues, and the resulting artificial shortage of raw material created a supply crisis and drove up costs to unsustainable levels for manufacturing facilities that used lumber.

42. The 2009 H-2B visa "cap" had already been exhausted as of March 17, 2009. *See* U.S. Citizenship and Immigration Services Press Release, "USCIS Reaches H-2B Cap for Second Half of Fiscal Year 2009" (January 8, 2009).

43. The H-2A program does not have caps, and so after the Chao Final Rule was promulgated, the forest products industry was optimistic that it would be able to secure sufficient labor under a stable, predictable federal program. Indeed, in 2009, for the first time in years, the labor needs of the forest products industry have been met because of the availability of H-2A workers.

44. However, the Solis Final Rule puts logging guestworkers back under the H-2B program rather than the H-2A program. *See* 74 Fed. Reg. 25980-81, 26002, *et seq.* (May 29, 2009) to be codified at 29 C.F.R. §655.200, *et seq.*

45. Although the Solis Final Rule will not take effect until after most of the H-2A logging workers for 2009 have been applied for or are already working, the forest products industry will be faced with serious labor shortages in 2010 and beyond because it is unable to consistently meet its labor demands through the highly restrictive H-2B program, in conjunction with U.S. workers.

18

46. The Solis Final Rule provides that it will apply only to applications for H-2A workers that were filed on or after June 29, 2009, the effective date of the Solis Final Rule. Applications filed from January 17, 2009 (the effective date of the Chao Rule) through June 28, 2009, will be subject to the Chao Final Rule ("the Grandfather Clause"). *See, e.g.*, 74 Fed. Reg. 25979. The Grandfather Clause will not help farmers or Christmas tree growers who will not have filed all of their H-2A applications before the effective date of the Solis Final Rule.

### The Solis NPRM

47. In December 2008, while still a California Congresswoman, Hilda L. Solis publicly expressed significant hostility toward the then-recently promulgated.Chao Final Rule in a posting on her website. Then-Rep. Solis said,

> . . . This recent action by the Bush Administration is just the latest example of how out of touch the president is with working families, especially with Latino families that make up a large portion of the farmworkers in this country. There is no question that the guestworker program needs significant overhaul but slashing wages [sic] and reducing basic rights for the most vulnerable workers in our country, especially hardworking Latino farmworkers, is not the answer.

48. On or about March 13, 2009, Ms. Solis was sworn in as Secretary of Labor. Within hours, she had issued a press release indicating her intent to suspend the Chao Rule. Then, on March 17, 2009, Secretary Solis issued the Solis NPRM, which was referred to as a "Notice of Proposed Suspension."

49. In actuality, this Notice of Proposed Suspension was a Notice of Proposed Rulemaking that is subject to the requirements of the APA. The Solis NPRM did much more than just "suspend" a particular regulatory provision; it proposed to nullify the entire H-2A regulatory structure (the Chao Final Rule) that was currently in place.

Though the DOL calls this a "suspension," it is in effect a nullification or revocation of the Chao Final Rule. Secretary Solis did not merely "suspend" compliance with the regulatory requirements of the Chao Final Rule; rather, she proposed requiring compliance with an entirely different set of regulatory standards that are wholly inconsistent with the Chao Final Rule. The Solis NPRM also resurrects the 1987 Rule that was replaced by the Chao Final Rule. Meanwhile, some of the Plaintiffs and other farmers have made financial and business plans for Calendar Year 2009 based on the requirements and standards in the Chao Final Rule.

50.     The Solis NPRM provided the public with an inadequate 10 days to comment on the significant and complex proposed changes to hundreds of pages of regulations, effectively preventing most affected farmers from having a meaningful opportunity to comment because the suspension was issued in the thick of many farmers' seeding and planting time. With the unreasonably and arbitrarily short comment period, the public managed to submit only approximately 800 comments – a mere 7 percent of the number of comments DOL received in 2008 in response to the Chao NPRM. *See* 74 Fed. Reg. at 25973; 73 Fed. Reg. at 77111. Of the 800 comments received by DOL in response to the Solis NPRM, approximately 99 percent opposed the proposed regulatory changes.

51.     Moreover, the Solis NPRM explicitly stated that the DOL would not consider any comments regarding the substance or merits of any regulatory provisions DOL proposed to replace (the Chao Final Rule), nor any of the regulatory provisions DOL proposed to implement (the 1987 Rule). *See* 74 Fed. Reg. at 11408. This restriction prevented the DOL from receiving information from the public directly relevant to the

20

decision about what regulatory provisions should govern the H-2A program and had a chilling effect on interested parties who would otherwise have submitted comments. Moreover, views about the merits of individual provisions of the Chao Final Rule and individual provisions of the Solis NPRM/1987 Rule are so inextricably intertwined with a decision about what regulatory provisions should govern the H-2A program that it is impossible to meaningfully separate comments on the merits from comments on whether or not the Chao Final Rule should be replaced with the Solis NPRM/1987 regulatory regime. In the Preamble to the Solis Final Rule, the DOL says that it "reviewed" but "did not consider" comments that it deemed to be outside the scope of this arbitrary limitation. *See* 74 Fed. Reg. 25973. Upon information and belief, the DOL applied this vague criterion to achieve the result that it desired: that is, to give disproportionate "consideration" to comments that favored its regulatory proposal (the so-called suspension) while appearing to be even-handed.

52. The Solis NPRM and the Solis Final Rule contain vague statements about the DOL's rationale that are not supported by any specific facts and that seem to contradict what information is available.

53. The Solis Final Rule contains a Grandfather Clause that will not help the Plaintiffs and other farmers because many farmers apply for H-2A workers in "waves" throughout the season; thus, even if the first waves of 2009 season H-2A workers are subject to the Chao Final Rule, subsequent waves later this season will not be. This means that the farmers' work forces will be governed by two very different, and even inconsistent, sets of rules that among other things could lead to significant labor strife resulting from workers performing the same work side by side, yet subject to differing

21

standards and rates of pay. The DOL failed to adequately consider the impact of its regulatory action and failed to address comments raising this issue. The Solis Final Rule will also subject farmers themselves to different and inconsistent requirements, standards, obligations, and penalties. The DOL likewise failed to address this result of its regulatory changes. Moreover, the Grandfather Clause will do nothing to alleviate harm that will be suffered by farmers who made irreversible business commitments before March 17, 2009, in reliance on the Chao Final Rule.

## FIRST CAUSE OF ACTION

### Violation of the Administrative Procedure Act, 5 U.S.C. §§553 and 701, *et seq.*

54. The Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-53 of the Complaint as if fully set forth herein.

55. Secretary Solis, in December of 2008, publicly declared her hostility toward the Chao Final Rule. Secretary Solis, within hours of taking office, also issued a press release indicating her intent to suspend the Chao Rule, and the Solis NPRM was issued only four days after she took office. Upon information and belief, this means the Secretary and the DOL decided in advance to replace the Chao Final Rule with a new regulatory regime before considering, and without regard to the content of, public comments on the issue. Upon information and belief, the DOL prejudged the issue, ignored substantive comments that opposed the proposed regulatory change, and failed to adequately deliberate before issuing the Solis Final Rule.

56. Upon information and belief, the DOL did not give fair consideration to comments submitted in opposition to the suspension.

22

57. In the Solis NPRM, the DOL made a number of conclusory statements in support of its proposed regulatory change without providing the public with sufficient details or information to make an informed judgment about, or to challenge the basis for, the Department's proposed changes. Specifically, the DOL said that "it is rapidly becoming evident that the Department [of Labor] and the [State Workforce Agencies, or "SWAs"] may lack sufficient resources to effectively and efficiently implement the [Chao Rule]." 74 Fed. Reg. at 11409. The DOL said it "may" lack sufficient resources but provided no information regarding its current level of resources, nor what what level of resources would be sufficient to implement the rule, thus depriving the public of a meaningful opportunity to evaluate that claim or provide relevant counter evidence rebutting the reasons for the DOL's proposed regulatory change. Some commenters did provide specific data on the DOL's current funding levels indicating a near 50% increase over the prior year funding, yet the DOL ignored or dismissed such comments and evidence without adequate consideration or explanation.

58. The DOL said that it had been "unable to implement the sequence of operational events required to avoid confusion and application processing delays." *Id.* The DOL failed to provide a coherent plain language explanation of the meaning of the vague terms "sequence of operational events" or examples of those operational events, thus depriving the public of a meaningful opportunity to evaluate that claim or provide relevant counter evidence rebutting the stated reasons for the DOL's proposed regulatory change. Some commenters did provide information they believed relevant to the vague "operational events" to which the DOL was referring and that indicated the DOL had, contrary to its assertions, in fact successfully implemented the operational events. Yet the

23

DOL ignored or dismissed such comments and evidence without adequate consideration or explanation.

59. The DOL said that it "ha[d] increasing evidence that implementation of a complex new regulatory program . . . before additional examination of the relevant legal and economic concerns is proving unnecessarily disruptive and confusing to the Department's administration of the H-2A program, SWAs, agricultural employers, and domestic and foreign workers." *Id.* The DOL, although alleging it "ha[d] increasing evidence" supporting its conclusion that the Chao Rule was disruptive and confusing, provided no such evidence in the NPRM and thus deprived the public of a meaningful opportunity to evaluate that evidence or provide evidence rebutting the stated reasons for the DOL's proposed regulatory change. Several commenters did provide specific information they believed relevant to the DOL claims of disruption and confusion, showing that rewriting the Chao Final Rules in the middle of the season in order to impose a different regulatory regime before the DOL promulgated a third version of regulations later in the year would result in more disruption and confusion, yet the DOL ignored or dismissed such comments and evidence without adequate consideration or explanation.

60. The DOL failed to provide specific facts and reasoned analysis in support of any of these conclusory statements, which conflicted with detailed analysis and specific findings made by the DOL when it issued the Chao Final Rule. Upon information and belief, these conclusory statements by the DOL in the Solis NPRM and Solis Final Rule were intended to create the false impression that the DOL had complied with §553(b)(B) of the APA.

24

61. In the Solis Final Rule, the DOL elaborated slightly on these vague and conclusory statements in the Solis NPRM and provided data and information that purported to support the DOL's decision, but such data and information were not provided in the NPRM and not subject to evaluation by the public. In addition, in arriving at its decision, the DOL relied on facts and information gathered after the close of the public comment period and not subject to evaluation by the public. Moreover, the Solis Final Rule noted that there were objections to its stated rationale for the regulatory change, but failed to consider or rebut those objections. *See* 74 Fed. Reg. 25973-74.

62. In the Solis Final Rule, the DOL further discusses its allegation contained in the Solis NPRM that the Chao Final Rule causes significant H-2A application "processing delays" and claims that those delays will be resolved by resurrection of the 1987-era regulations. The DOL received numerous comments opposing this rationale and citing the significantly worse delays that existed under the 1987 Rule. The DOL purports to rebut the comments opposing their rationale through an awkward manipulation of statistics. For example, in claiming that there were unacceptable "processing delays" under the Chao Final Rule, the DOL relies on "median" delays rather than "mean" (average) delays. Despite their availability, the DOL failed to provide in the Solis NPRM the data it relies on in purported support of its position in the Solis Final Rule. Moreover, the DOL relies on data in the Solis Final Rule that was accumulated after the close of the NPRM comment period and upon which the public had no opportunity to comment or challenge. Finally, the DOL acknowledges that "there is no evidence that the current delays have caused harm," yet it nonetheless finalizes the proposal as a remedy to these alleged delays that cause no harm. In addition, the DOL claims a rewriting of the entire

25

H-2A regulatory regime (by replacing the Chao Final Rule with the Solis Final Rule) was necessary, but the DOL failed to consider alternative regulatory and non-regulatory options for solving the problems it claimed exist, including rewriting only the regulatory provisions responsible for the alleged delays and confusion.

63.     The DOL has cited no problems relating to the vast majority of regulatory provisions governing the H-2A program, and there is no justification or explanation in the Solis Final Rule for replacing those provisions. For example, the substantially increased protections for workers in the Chao Final Rule have no effect whatsoever on the time required to process an application. There is no reasoned basis or analysis justifying the DOL's decision to effectuate a wholesale replacement of an entire regulatory regime when a targeted revision of specific regulatory provisions could easily remedy the defects that the DOL alleges exist. The prior regulatory regime (Chao Final Rule) was supported by a reasoned analysis supporting each regulatory provision and the basis supporting each of those provisions cannot now be rejected with a generalized vague claim that the entire regime creates confusion and disruption. The DOL approach is equivalent to using a bulldozer to accomplish what could and should be done with a scalpel. *See* 74 Fed. Reg. 25975-76.

64.     The DOL issued the Solis NPRM on March 17, 2009, while most farmers using the H-2A program were in the thick of planting and seeding, and provided only a 10-day comment period. The DOL said that this drastically curtailed comment period was "necessary due to the time constraints and concerns inherent in the Department's administration of the H-2A program, and in the use of the H-2A program by the agricultural community," and expressed "concern" about "uncertainty" for farmers if a

26

longer comment period were allowed. *Id.* In addition to providing no factual basis for its conclusions, the DOL's "concern" rings hollow considering that the Solis NPRM was issued in the midst of the 2009 spring growing season, and only after H-2A farmers had already conducted their business and financial planning for 2009 in reliance on the Chao Final Rule. In addition, despite claiming there was insufficient time for a longer comment period, the DOL then waited more than 90 days before effectuating the changes it proposed. Essentially, the DOL argued in the Solis NPRM that there wasn't time for a normal comment period because the rewrite of the regulations had to be accomplished virtually immediately. But then the DOL waited months to issue the Solis Final Rule and now claims that it has foreclosed much of the resulting harm from the Chao Final Rule and the Solis Final Rule by letting the intervening time pass since the NPRM. Both rationales for rewriting the Chao Final Rule cannot be true. Upon information and belief, the DOL's conclusory statements in the NPRM were a sham rationale intended to disguise the fact that the DOL wished to foreclose meaningful comments from farmers, growers' associations and advocates, and the forest products industry.

65.     The Solis NPRM specifically prohibited comments relating to the merits or substance of the Chao Final Rule or of the replacement provisions from the 1987 Rule that were proposed by the Solis NPRM. *See* 74 Fed. Reg. at 11408: "Please provide written comments only on whether the Department should suspend the [Chao Final Rule] for further review and consideration of the issues that have arisen since the final rule's publication. *Comments concerning the substance or merits of the [Chao Final Rule or the 1987 Rule] will not be considered.*" (Emphasis added.) In fact, the DOL says in the Solis Final Rule that it did not consider comments that it deemed to be dealing with the merits

27

of either rule. *See* 74 Fed. Reg. 25973. Thus, in addition to providing a drastically curtailed comment period, the DOL has foreclosed public comment integral to its decision to rewrite the Chao Rule. This restriction on comment subject matter had an unreasonable chilling effect on comments relating to the relative merits of particular regulatory provisions the DOL proposed implementing, as well as comments in opposition to the DOL's regulatory action. Upon information and belief, this "two-sided" restriction was a sham. Although it adversely affected members of the regulated community who were opposed to the DOL regulatory proposal, it did not adversely affect their counterparts who were in favor of DOL's proposal  because the DOL had already made up its mind to replace the Chao Final Rule. Moreover, to compartmentalize discussion of this issue in such a manner effectively guaranteed that the DOL's determination of which comments fell within the required "scope" would be arbitrary and capricious. This restriction prohibiting the public from commenting on the substantive merits of an agency's proposed regulatory provisions  violates §553(e) of the APA ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.")

66.    Upon information and belief, the DOL did not adequately consider the impact on farmers of a substantive rule change to take effect in the middle of a growing season, including but not limited to the impact of the mid-season rule change on the farmers' pre-existing contractual and other obligations.

67.    Because some farmers, in reliance on the Chao Final Rule, had already entered into binding and irreversible contractual and other obligations for 2009 as of

March 17, 2009, when the Solis NPRM was issued, the Solis Final Rule has an impermissible retroactive effect that the Grandfather Clause will not alleviate.

68.     Upon information and belief, the DOL in issuing the Solis NPRM and the Solis Final Rule did not consider the harm that would be suffered by the forest products industry, which cannot obtain sufficient numbers of U.S. or foreign guest workers through the H-2B program to which it is being reassigned.

69.     The Solis NPRM did not provide any justification for revoking the Chao Final Rule as it related to the agricultural status of Christmas tree farmers, but the Solis Final Rule provided for the first time the alleged rationales of impact on the FLSA minimum wage and child labor provisions, and impact on low-wage earners. *See* 74 Fed. Reg. 25982. Because these alleged rationales were not included in the Solis NPRM, the public was deprived of notice and an opportunity for comment.

70.     The Regulatory Flexibility Act /Small Business Regulatory Enforcement Fairness Act ("RFA/SBREFA"), 5 U.S.C. §601, *et seq.*, requires agencies to consider the impact of their regulatory proposals on small entities, analyze alternatives to minimize that impact, and make the analyses available for public comment. As part of this rulemaking, the DOL failed to include the required analysis; failed to provide the public with an opportunity to comment on that analysis; and failed to include a final analysis when publishing the Solis NPRM. 5 U.S.C. §§ 604, 609.

71.     In lieu of preparing the analysis required under 5 U.S.C. §603(a), the RFA/SBREFA permits an agency to certify that the proposed rulemaking is not expected to have a significant economic impact on a substantial number of small entities and include such certification at the time of publication of the proposed rule or the final rule,

Case 1:09-cv-00411-WO-LPA   Document 1   Filed 06/09/09   Page 29 of 35

along with the factual basis for such certification. 5 U.S.C. § 605. The DOL has included no such certification as part of this rulemaking. In addition, the DOL has failed to provide any factual basis or analysis supporting such a certification; and has failed to provide the public with an opportunity to comment on any factual basis and analysis supporting such a certification. 5 U.S.C. §§ 604, 605, 609.

72. The Solis NPRM violates the RFA/SBREFA because it fails to include an analysis of the impact of the suspension on small entities; fails to provide the public with an opportunity to comment on the analysis; fails to include a certification that the suspension will not have a significant economic impact on small entities; fails to provide any factual basis or analysis supporting such a certification; and fails to provide the public with an opportunity to comment on the factual basis and analysis supporting such a certification.

73. The Unfunded Mandates Reform Act, 2 U.S.C. §1501, *et seq.* ("UMRA"), requires agencies to assess the effects of federal regulatory action on state, local and tribal governments, and the private sector, including determining whether the regulatory action imposes a federal mandate. 2 U.S.C. §§ 1531, 1532, 1533. The Solis NPRM contained no such assessments or analyses.

74. The Solis NPRM violated the requirements of the UMRA because it failed to include the assessments and analyses on the effects of the regulatory action on state, local and tribal governments, and the private sector, including determining whether the regulatory action imposes a federal mandate.

75. Executive Order 12866 (Regulatory Planning and Review) requires agencies to determine whether a regulatory action is "significant" and therefore subject to

the requirements of the E.O. and subject to review by the Office of Management and Budget ("OMB"). The Solis NPRM failed to include the analyses required by the E.O., including whether the regulatory action is likely to have an annual effect on the economy of $100 million or more, or adversely and materially affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local or tribal governments or communities, as required by Section 3(f) of the E.O.

76.     Executive Order 13132 (Federalism) requires agencies to consult with States before and during the implementation of national policies that have a direct effect on the states, the relationship between the federal government and the states, or on the distribution of power and responsibilities among the various levels of government.  The DOL failed to include the required federalism summary impact statement in the Solis NPRM.

77.     Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments) requires agencies to develop policies in consultation with tribal officials when these policies have tribal implications.  The DOL failed to include the required tribal summary impact statement in the Solis NPRM.

78.     Section 654 of the Treasury and General Government Appropriations Act of 1999, 5 U.S.C. §601 note (Assessment of Federal Regulations and Policies on Families), requires agencies to assess the impact of federal regulations and policies on families, including whether the regulation strengthens or erodes the stability, integrity, autonomy, or safety of the family. The DOL failed to include the required assessment in the Solis NPRM.

79.     Executive Order 12630 (Governmental actions and interference with constitutionally protected property rights) requires agencies to evaluate all policies and regulations to ensure there is no impact on constitutionally protected property rights. The DOL failed to include such evaluation in the Solis NPRM.

80.     Executive Order 12988 (Civil Justice Reform) requires agencies to draft regulations in a manner that will reduce needless litigation and will not unduly burden the federal court system. The DOL failed to include in the Solis NPRM any determination of whether the regulatory action met the requirements of the E.O.

81.     Executive Order 13211 (Actions Concerning Regulations that Significantly Affect Energy Supply, Distribution or Use) requires agencies to determine whether a regulation is likely to have a significant adverse effect on the supply, distribution, or use of energy. The DOL failed to include in the Solis NPRM any determination of whether the regulatory action met the requirements of the E.O., or a Statement of Energy Effects or summary thereof, as required by the E.O.

82.     Because of these deficiencies, the Solis Final Rule in its entirety violates the Administrative Procedure Act and is arbitrary and capricious, and contrary to law, and should be set aside. *See* 5 U.S.C. §706(2)(A), (C), and (E).

### SECOND CAUSE OF ACTION
**Violation of the Administrative Procedure Act,**
**5 U.S.C. §701, *et seq*.**

83.     The Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-82 of the Complaint as if fully set forth herein.

84.     Christmas tree farming clearly falls within the definition of "agriculture" in §203(f) of the FLSA: "'Agriculture'" includes farming *in all its branches* and *among*

32

*other things includes the cultivation and tillage of the soil*, dairying, *the production,*
*cultivation, growing, and harvesting of any agricultural or horticultural commodities*
(including commodities defined as agricultural commodities in section 15(g) of the
Agricultural Marketing Act, as amended), the raising of livestock, bees, fur-bearing
animals, or poultry, . . ." (emphasis added). The U.S. Court of Appeals for the Fourth
Circuit has held that Christmas tree farming is "agriculture" and that previous attempts by
the DOL to classify it as "forestry" were not entitled to deference under *Skidmore v. Swift*
*& Co.,* 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944), because the
interpretations were not reasonable and also conflicted with the plain language of the
statute. *See U.S. Dep't of Labor v. N.C. Growers' Ass'n, Inc.,* 377 F.3d 345 (4th Cir.
2004).

85.      Nonetheless, the Solis Final Rule provides that Christmas tree farming
will be treated as "non-agriculture." *See* 74 Fed. Reg. at 25982, 26014, to be codified at
29 C.F.R. §780.115, *et seq*. ("the Christmas tree regulations").

86.      The Christmas tree regulations in the Solis Final Rule conflict with the
plain language of the FLSA and therefore exceed the DOL's authority and violate the
Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C), and (E), and should be set aside
as contrary to law.

## PRAYER FOR RELIEF

For the reasons set forth in this Complaint, the Plaintiffs pray the Court for the
following relief:

1)       That a declaratory judgment be issued, declaring that *Temporary Employment of H-2A Aliens in the United States,* 74 Fed. Reg. 25972 (May 29, 2009) is unlawful and is null and void; and

2)       That a preliminary injunction be granted, pending a decision on the merits, that enjoins the Defendants from giving effect to or implementing in any manner *Temporary Employment of H-2A Aliens in the United States,* 74 Fed. Reg. 25972 (May 29, 2009), or *Withdrawal of Interpretation of the Fair Labor Standards Act Concerning Relocation Expenses Incurred by H-2A and H-2B Workers*, 74 Fed. Reg. 13261 (March 26, 2009); and

3)       That a permanent injunction be issued, enjoining the Secretary of Labor and the Secretary of Homeland Security, and the DOL and the DHS, from implementing *Temporary Employment of H-2A Aliens in the United States,* 74 Fed. Reg. 25972 (May 29, 2009) or *Withdrawal of Interpretation of the Fair Labor Standards Act Concerning Relocation Expenses Incurred by H-2A and H-2B Workers*, 74 Fed. Reg. 13261 (March 26, 2009); and

4)       In the alternative to the injunctive relief sought with respect to *Withdrawal of Interpretation of the Fair Labor Standards Act Concerning Relocation Expenses Incurred by H-2A and H-2B Workers*, 74 Fed. Reg. 13261 (March 26, 2009), that a declaratory judgment be issued, declaring that farmers who applied for H-2A workers, and who executed Clearance Orders that were approved by the DOL and executed by H-2A workers, between January 17, 2009 and March 26, 2009, may not be subjected to liability under the *Arriaga* theory based on failure to reimburse workers' relocation expenses (as defined in this Complaint) when they were paid for their first workweeks; and

34

5) That the Plaintiffs be awarded their costs in pursuing this action, including reasonable attorneys' fees; and

6) That the Court award such other relief as it may deem just and proper.

This the 9th day of June, 2009.

/s/W. R. Loftis, Jr.
N.C. State Bar No. 2774
rloftis@constangy.com
**CONSTANGY, BROOKS & SMITH, LLP**
100 N. Cherry St., Suite 300
Winston-Salem, NC  27101
Telephone: 336-721-1001
Facsimile: 336-748-9112