**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NORTH CAROLINA GROWERS'
ASSOCIATION, INCORPORATED;
NATIONAL CHRISTMAS TREE
ASSOCIATION; FLORIDA FRUIT &
VEGETABLE ASSOCIATION; VIRGINIA
AGRICULTURAL GROWERS
ASSOCIATION, INCORPORATED; SNAKE
RIVER FARMERS ASSOCIATION;
NATIONAL COUNCIL OF
AGRICULTURAL EMPLOYERS; NORTH
CAROLINA CHRISTMAS TREE
ASSOCIATION; NORTH CAROLINA
PICKLE PRODUCERS ASSOCIATION;
FLORIDA CITRUS MUTUAL; NORTH             No. 11-2235
CAROLINA AGRIBUSINESS COUNCIL,
INCORPORATED; MAINE FOREST
PRODUCTS COUNCIL; ALTA CITRUS,
LLC; EVERGLADES HARVESTING &
HAULING, INCORPORATED; DESOTO
FRUIT & HARVESTING,
INCORPORATED; FOREST RESOURCES
ASSOCIATION; TITAN PEACH FARMS,
INCORPORATED; H-2A USA,
INCORPORATED; OVERLOOK
HARVESTING COMPANY, LLC,

                    *Plaintiffs-Appellees,*

          v.

UNITED FARM WORKERS; JAMES CEASE; MARIO CENTENO-RODRIGUEZ; JUAN CISNEROS-IBARRA; LUIS ENRIQUE CISNEROS-IBARRA; REYMUNDO GUTIERREZ; CARLOS LUIS GUZMAN-CENTENO; JOSE RAUL GUZMAN-CENTENO; ABELARDO HERNANDEZ-AGUAS; GREGORIO HUERTAS-SAMANO; PEDRO IBARRA-AVILA; ATANACIO LUGO-RINCON; OBDULA MALDONADO-ABELLANEDA; MIGUEL ANGEL OLGUIN-HERNANDEZ; ARTURO OLGUIN-MONROY; OMERA RODRIGUEZ-GUZMAN; DESIDERIO TOVAR-ZAPATA; ALEJANDRO TREJO-LEON,

*Intervenors/Defendants-Appellants,*

and

HILDA L. SOLIS, in her official capacity as United States Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; JANET NAPOLITANO, in her official capacity as United States Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants.*

HOWARD BERMAN; JUDY CHU;
GEORGE MILLER; LYNN WOOLSEY,

    *Amici Supporting Appellants,*

*USA FARMERS, INC.,*

    *Amicus Supporting Appellees.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
William L. Osteen, Jr., District Judge.
(1:09-cv-00411-WO-LPA)

Argued: October 23, 2012

Decided: December 21, 2012

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Judge Wilkinson and Judge Diaz joined. Judge Wilkinson wrote a separate concurring opinion.

---

## COUNSEL

**ARGUED:** Naomi Ruth Tsu, SOUTHERN POVERTY LAW CENTER, Atlanta, Georgia, for Appellants. Robin Elizabeth Shea, CONSTANGY, BROOKS & SMITH, LLC, Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** Andrew H. Turner, BUESCHER, GOLDHAMMER & KELMAN, Denver, Colorado; Gregory S. Schell, MIGRANT FARM-WORKER JUSTICE PROJECT, Lake Worth, Florida; Robert

J. Willis, LAW OFFICE OF ROBERT J. WILLIS, Raleigh, North Carolina, for Appellants. William R. Loftis, Jr., CON-STANGY, BROOKS & SMITH, LLC, Winston-Salem, North Carolina, for Appellees. Jonathan G. Cedarbaum, Lillian Howard Potter, Annie L. Owens, WILMER CUTLER PICK-ERING HALE AND DORR, LLP, Washington, D.C., for Amici Supporting Appellants. Leon R. Sequeira, SEYFARTH SHAW LLP, Washington, D.C., for Amicus Supporting Appellees.

---

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

This appeal involves a regulatory action by the Department of Labor (the Department), which suspended various regulations for temporary agricultural workers and reinstated other prior regulations. We primarily consider: (1) whether the Department's action constituted "rule making" under the Administrative Procedure Act (the APA), 5 U.S.C. §§ 553, and 701 through 706; and (2) if the action was "rule making," whether the Department satisfied the APA's "notice and comment" requirements.

We conclude that the district court correctly determined that the Department: (1) engaged in "rule making" when reinstating the prior regulations; and (2) failed to comply with the notice and comment procedures mandated by the APA. We also conclude that the Department did not invoke the "good cause exception" provided by the APA to excuse its failure to comply with these notice and comment requirements. Accordingly, we hold that the district court did not err in invalidating the Department's action on the ground that it was arbitrary and capricious.

## I.

### 1.  *The 1987 Regulations*

In 1986, Congress passed the Immigration Reform and Control Act amendments to the Immigration and Nationality Act, which permitted the temporary admission of foreign workers to engage in agricultural jobs in the United States (the H-2A program). *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). In 1987, the Department promulgated regulations governing the H-2A program to effectuate Congress' intent that domestic agricultural workers (U.S. workers) be given preference over foreign agricultural workers (H-2A workers), and that the employment of H-2A workers would not adversely affect the wages or working conditions of U.S. workers (collectively, the 1987 regulations, or the 1987 rule). *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture; Adverse Effect Wage Rate Methodology, 54 Fed. Reg. 28,037 (July 5, 1989); Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging, 52 Fed. Reg. 20,496 (June 1, 1987). An agricultural employer seeking to participate in the H-2A program is required to apply with the Department and certain other federal agencies, certifying that there are insufficient U.S. workers available to perform work for the employer and agreeing to abide by requirements regarding wages, housing, and working conditions. *See* 52 Fed. Reg. at 20,513-20,516.

The 1987 regulations required, among other things, that participating employers pay H-2A workers and similarly-situated U.S. workers a wage rate calculated by a formula, which is known as an "adverse effect wage rate" (AEWR). *See* 54 Fed. Reg. at 28,038. AEWRs are minimum hourly wage rates that must be paid under the H-2A program to foreign and U.S. agricultural workers, and are intended to ensure that H-2A workers do not have an adverse effect on the wages and working conditions of similarly-employed U.S. workers. *Feller v. Brock*, 802 F.2d 722, 724 (4th Cir. 1986); 54 Fed.

Reg. at 28,038. With only minor amendments, such as the annual recalculations of the AEWRs, the 1987 regulations remained in effect until January 16, 2009.

## 2.   *The 2008 Regulations*

In February 2008, the Department published a notice of proposed rule making, stating that the agency intended to make substantial changes to the H-2A program. Temporary Agricultural Employment of H-2A Aliens; Modernizing the Labor Certification Process and Enforcement, 73 Fed. Reg. 8538 (Feb. 13, 2008). A 60-day comment period was provided, during which the Department received 11,000 comments. *See* Temporary Agricultural Employment of H-2A Aliens; Modernizing the Labor Certification Process and Enforcement, 73 Fed. Reg. 77,110, 77,111 (Dec. 18, 2008); Extension of Comment Period, 73 Fed. Reg. 16,243 (Mar. 27, 2008). A final rule was published in December 2008 and became effective on January 17, 2009 (collectively, the 2008 regulations, or the 2008 rule). *See* 73 Fed. Reg. 77,110 (Dec. 18, 2008). The 2008 regulations changed the method by which AEWRs were calculated.[1] 73 Fed. Reg. at 77,166-77,178. Many agricultural employers relied on the terms of the 2008 regulations when entering into labor and production contracts, and in making other business commitments for the 2009 growing season. There is no dispute that the 2008 regulations were validly promulgated.

The classification of foreign seasonal workers employed on Christmas tree farms also is at issue in this appeal. Under the Department's prior practice, such workers were defined as "agricultural" employees under the H-2A program, but as "non-agricultural," "forestry" employees under the Fair Labor

---

[1]The Department published the AEWR rates for 2008 in a separate notice. *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging: 2008 AEWRs and Other Provisions, 73 Fed. Reg. 10,288 (Feb. 26, 2008).

Standards Act (FLSA), 29 U.S.C. §§ 201 through 219. The Department's distinction in this regard was material, because, among other things, persons "employed in agriculture" do not qualify to receive "overtime" pay under the provisions of the FLSA. 29 U.S.C. § 213(b)(12). Therefore, under the Department's prior practice, growers of Christmas trees not only were required to provide their H-2A workers with housing, meals, and transportation benefits set forth in the Immigration Reform and Control amendments to the Immigration and Nationality Act, but also were required to pay the H-2A workers for overtime hours worked.

In 2004, this Court found that the Department's position regarding the classification of H-2A workers on Christmas tree farms, adopted without rule making allowing notice and comment and without a formal adjudication, lacked any statutory foundation and was not a persuasive interpretation of the FLSA. On that basis, this Court invalidated the Department's determination. *Dep't of Labor v. N.C. Growers' Ass'n*, 377 F.3d 345 (4th Cir. 2004). In accordance with this precedent, the 2008 regulations defined H-2A workers on Christmas tree farms as "agricultural" employees for purposes of both the H-2A program and the FLSA. *See* 73 Fed. Reg. at 77,201-77,202.

3.  *The 2009 Suspension*

In March 2009, just two months after the 2008 regulations took effect, Hilda Solis, the newly-appointed Secretary of Labor, issued a "notice of proposed suspension" of the 2008 regulations (the 2009 Notice). Temporary Employment of H-2A Aliens in the United States, 74 Fed. Reg. 11,408 (Mar. 17, 2009). In the 2009 Notice, the Department proposed to suspend the 2008 regulations, during a nine-month period, for further review and reconsideration "in light of issues that have arisen since the publication of the [2008 regulations]." 74 Fed. Reg. at 11,408. The 2009 Notice also stated that during the period that the 2008 regulations would be suspended, the

Department proposed "to reinstate on an interim basis" the 1987 regulations to avoid a "regulatory vacuum" in the H-2A program. *Id.*

The Department articulated various reasons in the 2009 Notice to support the proposed suspension and reinstatement, including: (1) a lack of agency resources to implement the 2008 regulations efficiently; (2) delays resulting from processing increased numbers of H-2A applications under the 2008 regulations, which volume was expected to impede the Department's performance of its statutory duty "to process H-2A applications within a strict timeframe"; (3) the Department's inability "to implement the sequence of operational events" required to process applications under the 2008 regulations; (4) the Department's inability to develop an "automated review system" for applications, requiring the Department to review them manually; (5) the 2008 regulations were a "complex new regulatory program," the implementation of which was proving disruptive and confusing to the Department and to stakeholders; (6) avoidance of disruption during "the severe economic conditions" facing the country; (7) the Department "may differ" with the policy positions of the prior Administration, on which the 2008 regulations were based; (8) growers "require clear and consistent guidance" to "plan and staff their operations appropriately for the impending growing season"; and (9) continuing to implement the 2008 regulations would not be an efficient use of resources by stakeholders or the Department in the event that the agency soon would issue a different rule. 74 Fed. Reg. at 11,408-11,409.

For agricultural employers who submitted H-2A applications before the proposed suspension, the Department stated that it would process their applications under the 2008 regulations then in effect. 74 Fed. Reg. at 11,409-11,410; Temporary Employment of H-2A Aliens in the United States, 74 Fed. Reg. 25,972, 25,979 (May 29, 2009). The Department allowed a 10-day period to receive comments on the proposed

suspension, citing the need for expediency, and stated that the Department only would consider comments concerning the suspension action itself, and not regarding the merits of either set of regulations (the content restriction):

> Please provide written comments only on whether the Department should suspend the [2008 regulations] for further review and consideration of the issues that have arisen since [their] publication. Comments concerning the substance or merits of the [2008 regulations] or the [1987 regulations] will not be considered.

74 Fed. Reg. at 11,408. During this 10-day period, 800 comments were received. 74 Fed. Reg. at 25,973.

On May 29, 2009, after two months of consideration, the Department published a "final rule; suspension of rule" that suspended the 2008 regulations, and reinstated the 1987 regulations, for a nine-month period effective June 29, 2009 (collectively, the 2009 Suspension). 74 Fed. Reg. 25,972 (May 29, 2009). In addition to the reasons set forth in the 2009 Notice, the Department also included as grounds supporting the decision the likely depressive economic effects of the 2008 regulations, and the lack of training by the Department, state agencies, and H-2A employers. 74 Fed. Reg. at 25,972-25,974. Although the Department acknowledged that many agricultural employers had planned for the 2009 growing season relying on the terms of the 2008 regulations, the Department partly discounted the possibility that the suspension would cause excessive disruption, noting that employers had operated under the 1987 regulations for several years and were familiar with their terms. 74 Fed. Reg. at 25,980.

Under the 2009 Suspension, agricultural employers hiring H-2A workers would be required to pay the higher wage rate afforded under the directives contained in the 1987 regulations. The Department also published higher AEWRs near the

end of May 2009, which were scheduled to take effect one month later.[2] *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging: 2009 AEWRs and Other Provisions, 74 Fed. Reg. 26,016 (May 29, 2009). Additionally, due to the 2009 Suspension, H-2A workers employed on Christmas tree farms again would be classified as "agricultural" employees for purposes of the H-2A program, but as "non-agricultural" employees for purposes of the FLSA, the same classification invalidated by this Court in *N.C. Growers' Ass'n.* 74 Fed. Reg. at 25,982.

4.   *The NCGA Files Suit To Enjoin Suspension*

In June 2009, the North Carolina Growers' Association, Inc., and other growers' associations, farmers, and related lobbying organizations (collectively, the NCGA), filed a complaint in the district court against the Department and other federal agencies (collectively, the federal defendants). The NCGA sought to enjoin the Department's 2009 Suspension, arguing that such action violated the APA. The district court granted the NCGA's summary judgment motion, and issued a preliminary injunction prohibiting implementation of the 2009 Suspension.

As a result of the district court's injunction, the 2008 regulations continued to govern administration of the H-2A program, and H-2A and U.S. agricultural workers were paid at lower wage rates for nine months based on the 2008 AEWRs and the 2008 regulations.[3] Thousands of agricultural workers and employers were affected by the changes in these regulations.

---

[2]This would result in a higher hourly wage both for H-2A workers and for U.S. agricultural workers who worked alongside the H-2A workers.

[3]For example, under the 2008 AEWR, an H-2A worker in North Carolina would be paid $8.85 per hour rather than $9.34 per hour under the 2009 Suspension. *See* 74 Fed. Reg. at 26,016 (2009 Suspension AEWR); 73 Fed. Reg. at 10,289 (2008 AEWR).

5.   *The 2010 Regulations*

In September 2009, the Department issued another notice of proposed rule making in a second attempt to replace the 2008 regulations.[4] *See* Temporary Agricultural Employment of H-2A Aliens, 74 Fed. Reg. 45,906 (Sept. 4, 2009) After issuing notice and receiving comment, the Department published new regulations governing the H-2A program (the 2010 regulations). *See* Temporary Agricultural Employment of H-2A Aliens, 75 Fed. Reg. 6884 (Feb. 12, 2010). The 2010 regulations largely restored the H-2A program to the status quo before 2008, and reinstituted the wages and working conditions established under the 1987 regulations. The 2010 regulations are not at issue in this appeal.

6.   *The Claims In The NCGA's Suit*

The district court held that the NCGA's claims against the federal defendants were moot, in light of the Department's promulgation of the 2010 regulations. In December 2009, the district court permitted the United Farm Workers, the Farm Labor Organizing Committee, AFL-CIO, and representative H-2A workers (collectively, the Farm Workers) to intervene as defendants in this case. The Farm Workers filed a purported class action counterclaim against the NCGA on behalf of H-2A workers and U.S. agricultural workers who had been paid at wage rates based on the lower AEWRs in effect during the preliminary injunction.

The Farm Workers sought the difference between the higher wages that would have been paid under the reinstated 1987 regulations, and the lower wages actually received by the workers under the 2008 regulations as a result of the district court's preliminary injunction. The Farm Workers sought

---

[4]Appeals from the district court's preliminary injunction order to this Court were later withdrawn in light of the Department's action promulgating the 2010 regulations.

payment of this wage differential for the period between June 29, 2009, the date that the reinstatement of the 1987 regulations would have taken effect, and March 14, 2010, the last day before the uncontested 2010 regulations took effect.

The parties filed cross motions for summary judgment on the issue whether the 2009 Suspension was promulgated in compliance with the APA. In its summary judgment decision, the district court held that issuance of the 2009 Suspension, that is, "the suspension of the 2008 Rule and reinstatement of the 1987 Rule[,] constituted 'rule making'" under the APA and required compliance with the APA's notice and comment procedures. The court further concluded that the 2009 Suspension violated the APA, because the Department refused to consider comments addressing the substance of either the 2008 regulations or the 1987 regulations. According to the court, these were relevant issues that the Department was required to consider before suspending the 2008 regulations and reinstating the 1987 regulations.

The district court held that the Department's failure to consider such comments rendered the Department's action imposing the 2009 Suspension arbitrary and capricious. The court granted the NCGA's motion for summary judgment, denied the Farm Workers' motion for partial summary judgment, and dismissed with prejudice the Farm Workers' counterclaims. The Farm Workers timely appealed.

## II.

We review de novo a district court's decision awarding summary judgment. *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012); Fed. R. Civ. P. 56(a).

The APA requires that agencies follow certain procedures before issuing a rule. 5 U.S.C. § 553. When an agency is

engaged in "rule making," the agency must: (1) publish a general notice of proposed rule making in the Federal Register that includes "the terms or substance of the proposed rule or a description of the subjects and issues involved"; (2) give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments"; and (3) "[a]fter consideration of the relevant matter presented . . . incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(b), (c).

The important purposes of this notice and comment procedure cannot be overstated. The agency benefits from the experience and input of comments by the public, which help "ensure informed agency decisionmaking." *Spartan Radiocasting Co. v. FCC*, 619 F.2d 314, 321 (4th Cir. 1980). The notice and comment procedure also is designed to encourage public participation in the administrative process. *See Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1103 (4th Cir. 1985). Additionally, the process helps ensure "that the agency maintains a flexible and open-minded attitude towards its own rules," *id.* (citation omitted), because the opportunity to comment "must be a meaningful opportunity," *Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011) (citation omitted).

Under the APA, a reviewing court will overturn an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 27, 41 (1983) (informal rule making procedures may be set aside if arbitrary, capricious, or not in accordance with law); *Almy v. Sebelius*, 679 F.3d 297, 302 (4th Cir. 2012) (same). As part of this review process, courts are charged with ensuring that agencies comply with the procedural requirements of the APA. *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979).

We have recognized that courts best provide oversight of an agency decision "by scrutinizing process and by determining whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Kennecott v. EPA*, 780 F.2d 445, 449 (4th Cir. 1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). These tasks are "the heart of the judicial inquiry," *id.* at 449, and fall within courts' "special areas of competence," *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 899-900 (D.C. Cir. 2006) (citation omitted). Thus, while our review of an agency's final decision is narrow, "we must be strict in reviewing an agency's compliance with procedural rules." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1103 (quoting *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 641 (1st Cir. 1979)).

### III.

We first consider the issue whether the Department's suspension of the 2008 regulations or its reinstatement of the 1987 regulations qualified as "rule making" under the APA, thereby triggering the statute's notice and comment requirements. If the contested action did not qualify as "rule making," as the Farm Workers contend, the Department was not required to provide notice and comment and the district court erred in enjoining the 2009 Suspension. However, if the Department did engage in "rule making," as the NCGA contends, the agency was required to comply with regular notice and comment procedures barring an express exception afforded under the APA.

The district court assumed, without deciding, that the Department's suspension of the 2008 regulations qualified as "rule making." The court held that "[i]n addition to withdrawing a rule, [the Department] *effectively formulated a new rule by reinstating the 1987 Rule*." (Emphasis added). The court further held that "rule making" under the APA "explicitly covers rule formulation," and, thus, reinstatement of the 1987

regulations required compliance with regular notice and comment procedures.

The Farm Workers contend that the district court's analysis was erroneous in two respects. First, the Farm Workers argue that the act of "reinstating" a rule does not fall within the definition of "rule making." According to the Farm Workers, "reinstating" means restoring something that is not new, while "formulating" means creating something new. Second, the Farm Workers contend that the Department's reinstatement of regulations that previously had been subject to notice and comment procedures did not require a "second rule making process before reinstatement." We disagree with the Farm Workers' arguments.

We begin by considering the relevant statutory language. Under the APA, a "rule" is defined as

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). The APA provides a "broad" definition of the term "rule making," *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 102 (4th Cir. 2006), which comprises the "agency process for *formulating*, amending, or repealing a rule." 5 U.S.C. § 551(5) (emphasis added). The parties do not dispute that the 1987 and 2008 regulations each constitute a "rule" under the APA. Instead, they dispute whether the Department's action qualified as "formulating" a rule, thereby constituting "rule making." As described above,

an agency engaging in "rule making" is required under the APA to provide notice of a proposed rule and the opportunity for comment. *See* 5 U.S.C. § 553.

We are not persuaded by the Farm Workers' textual argument that, under the APA, the act of "reinstating" a rule does not qualify as "formulating" a rule. This argument is not supported by any precedent, and actually is undermined by a definition of the term "formulating" cited by the Farm Workers, which is "to reduce to or express in or as if in a formula," or to "put into a systematized statement or expression." *See* Webster's Third New International Dictionary 894 (1986). Notably absent from this definition is any requirement of originality or novelty in the substance or text of the subject matter expressed. Thus, under this definition of "formulating," it is immaterial whether the rule at issue was newly drafted or was drawn from another source.

When the 2008 regulations took effect on January 17, 2009, they superseded the 1987 regulations for all purposes relevant to this appeal. As a result, the 1987 regulations ceased to have any legal effect, and their reinstatement would have put in place a set of regulations that were new and different "formulations" from the 2008 regulations.

We also find no merit in the Farm Workers' argument that the Department's action was not "rule making," but was merely a suspension of regulations as occurred in *American Mining Congress v. EPA*, 907 F.2d 1179, 1191 (D.C. Cir. 1990) (*AMC*), and *American Federation of Government Employees v. OPM*, 821 F.2d 761, 764 (D.C. Cir. 1987) (*AFGE*). Those cases concerned instances in which Congress, rather than the agency itself, caused the suspension of the regulation at issue. *AMC*, 907 F.2d at 1183-84; *AFGE*, 821 F.2d at 763-64. This factor, among others, renders these cases inapposite, because the APA's focus on promoting public notice and comment is not affected when Congress steps in and com-

pels agency action. *See Chocolate Mfrs. Ass'n*, 755 F.2d at 1103.

The Department's own conduct, however, is highly relevant and shows that the Department viewed the reinstatement of the 1987 regulations as "rule making." The Department published the 2009 Notice (entitled "Notice of proposed suspension of rule"), proposing both to suspend the 2008 regulations and to reinstate the 1987 regulations, and the Department sought and considered comments on such action. 74 Fed. Reg. at 11,408-11,409. The Department later promulgated the 2009 Suspension (entitled "Final rule; suspension of rule"), and explained the basis for its decision. 74 Fed. Reg. at 25,972-25,984. Similar attempts by an agency "to comply with APA notice-and-comment procedures suggest that the agency believed them to be applicable," and support the conclusion that "those procedures were applicable." *Manufactured Housing Inst. v. EPA*, 467 F.3d 391, 399 (4th Cir. 2006); *see also Kempthorne*, 473 F.3d at 102.

We therefore conclude that, by reinstating the superseded and void 1987 regulations (albeit temporarily), the Department engaged in the "formulating" and the "repealing" aspects of "rule making" under the APA. *See* 5 U.S.C. § 551(5). Thus, we hold that the Department's reinstatement of the 1987 regulations qualified as "rule making" under the "broad language" of that term, and that the Department was required to comply with the APA's notice and comment procedures. *See* 5 U.S.C. § 553; *Kempthorne*, 473 F.3d at 102.

IV.

The Farm Workers contend, nonetheless, that the Department did not violate the APA, because the Department's action fell within the "good cause" exception to the APA's notice and comment requirements. These notice and comment requirements do not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of

reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest" (the good cause exception). 5 U.S.C. § 553(b)(B).

The APA requires that the agency relying on the good cause exception "incorporate[ ] the finding [of good cause] and a brief statement of reasons therefor in the rules issued." 5 U.S.C. § 553(b)(B). This requirement, that an agency articulate its basis for dispensing with normal notice and comment, is not a procedural formality but serves the crucial purpose of ensuring that the exceptions do not "swallow the rule." *Cf. Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979) (conclusory statement or mere recital of good cause is not sufficient to qualify as good cause, otherwise, an exception to the notice requirement would be satisfied upon mere invocation of the rule).

Under the first statutory ground for good cause, notice and comment on a rule may be found to be "impracticable" when "the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings." *Nat'l Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 384-85 (2d Cir. 1978) (Friendly, J.) (quoting S. Rep. No. 752, at 200 (1945)); *see also Util. Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001) (the "impracticable" basis for good cause applies "when an agency finds that due and timely execution of its functions would be impeded by the notice and comment otherwise required" under the APA) (quoting *United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act* 30-31 (1947)). Examples of such circumstances under which good cause existed include an agency determination that new rules were needed "to address threats posing a possible imminent hazard to aircraft, persons, and property within the United States," or were "of life-saving importance to mine workers in the event of a mine explosion," or were necessary to "stave off any imminent

threat to the environment or safety or national security." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (citations and internal quotation marks omitted).

The second statutory ground, the "unnecessary" prong of the good cause exception, applies when an administrative rule is "a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." *Id.* at 94 (quoting *Util. Solid Waste Activities Group*, 236 F.3d at 755). Congress intended that rule making be exempted as "unnecessary" when amendments are "minor or merely technical," and of little public interest. *Nat'l Nutritional Foods Ass'n*, 572 F.2d at 384-85 (quoting S. Rep. No. 752, at 200); *see also Attorney General's Manual* at 30-31 (the "unnecessary" prong of the good cause exception refers to "the issuance of a minor rule or amendment in which the public is not particularly interested"). Lastly, the third statutory ground for good cause addresses circumstances when notice and comment on a rule are "contrary to the public interest." 5 U.S.C. § 553(b)(B). This public interest prong of the good cause exception "connotes a situation in which the interest of the public would be defeated by any requirement of advance notice." *Util. Solid Waste Activities Group*, 236 F.3d at 755 (quoting *Attorney General's Manual* at 31). Good cause is found on this basis "only in the rare circumstances when ordinary procedures – generally presumed to serve the public interest – would in fact harm that interest." *Mack Trucks*, 682 F.3d at 95.

We construe the good cause exception narrowly. *United States v. Gould*, 568 F.3d 459, 469 (4th Cir. 2009). There is a high bar to invoke the exception because "[t]he legislative history of the [APA] demonstrates that Congress intended the exceptions in § 553(b)(B) to be narrow ones." *Nat'l Nutritional Foods Ass'n*, 572 F.2d at 384. Indeed, "Congress expected, and the courts have held, that the various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced." *N.J.*

*Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).

As a result, the circumstances justifying reliance on the good cause exception are "rare," and will be accepted only after a reviewing court "examine[s] closely" the proffered reason for an agency's deviation from public notice and comment. *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981) (citation omitted). The good cause exception applies only in "emergency situations," or in cases when delay "could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see also Natural Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 911 (9th Cir. 2003) ("[N]otice and comment procedures should be waived only when delay would do real harm.") (citation and internal quotation marks omitted); *Util. Solid Waste Activities Group*, 236 F.3d at 754 (good cause exception "should be limited to emergency situations") (citation omitted).

We consider an explanation for good cause that the agency has advanced at the time of the rule making. *See Gould*, 568 F.3d at 469-70; *see also United States v. Garner*, 767 F.2d 104, 116-17 (5th Cir. 1985) (agency action must be upheld, "if at all, on the basis articulated by the agency itself" (quoting *State Farm*, 463 U.S. at 50)). Post-hoc explanations that an agency did not have to comply with regular notice and comment procedures are viewed with skepticism. *See, e.g.*, *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *Buschmann v. Schweiker*, 676 F.2d 352, 356-58 (9th Cir. 1982). And, manifestly, we "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43.

The present record reveals that the Department did not expressly invoke the good cause exception when reinstating the 1987 regulations. *See* 5 U.S.C. § 553(b)(B). Indeed, in undertaking its reinstatement of the 1987 regulations, the Department quoted the notice and comment requirements of

§ 553(b) and (c), but omitted the text of the good cause exception in subsection (b)(B). *See* 74 Fed. Reg. at 25,978. Moreover, nowhere did the Department state that allowing for notice and substantive comment on reinstatement of the 1987 regulations would be "impracticable," "unnecessary," or "contrary to the public interest," the only grounds for good cause provided by the statute. 5 U.S.C. § 553(b)(B).

We cannot lightly accept arguments that an agency, while failing to refer to the good cause exception, nevertheless implicitly relied on the exception. The statutory requirements in § 553(b)(B) are clear, and they constitute an important part of the APA's procedural safeguards related to agency rule making. *See Buschmann*, 676 F.2d at 356-58. Although we do not impose a rigid requirement that an agency must explicitly invoke the good cause exception, the contemporaneous agency record must manifest plainly the agency's reliance on the exception in its decision to depart from the required notice and comment procedures. *See Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 59 F.3d 1219, 1224 (Fed. Cir. 1995) (excusing agency's failure to "expressly cite section 553(b)(B)," when the agency "expressly noted that the interim regulations were not subject to the notice and public procedure requirements of 5 U.S.C. 553," and otherwise made clear its reliance on the exception (citation omitted)).

The Department did not plainly manifest its reliance on the good cause exception in this case. Rather, the record reflects the Department's position that the APA's notice and comment provisions were applicable, but that the agency had satisfied such obligations.

The Department actually provided notice and sought comment on the issue "whether to suspend the [2008 regulations] and reinstate on an interim basis the [1987 regulations]." 74 Fed. Reg. at 11,409. The Department stated the reasons why it "believe[d] that the 10-day comment period for this rule-

making [was] reasonable." 74 Fed. Reg. at 25,978. The Department also stated that "comments on the merits of the [2008 and 1987 regulations] would be appropriate when the merits of the program are actually at issue," apparently referring to a time after the period of suspension if the Department decided to engage in further rule making. *Id.* at 25,979. The Department did not justify its content restriction on the basis of urgency or exigency, but rather on its stated judgment that the merits of either program were not actually "at issue" because the 1987 regulations were reinstated only as "a temporary measure."[5] *Id.* at 25,979.

The 2009 Notice and Suspension therefore demonstrate that the Department attempted to justify its suspension of the 2008 regulations and its reinstatement of the 1987 regulations on the basis that such action complied with the APA's regular notice and comment procedure. Accordingly, we do not accept the proposition that "good cause" was invoked by the rationale offered by the Department in support of the proposed rule making. Such a conclusion would undermine the good cause exception, by permitting a party to invoke the exception only when challenged.

We hold that the language of the 2009 Notice and Suspension fails to show that the Department invoked the good cause

---

[5]The Department also stated that the suspension of the 2008 regulations and the reinstatement of the 1987 regulations would take effect after 30 days, pursuant to a separate notice and comment procedural rule set forth in 5 U.S.C. § 553(d). 74 Fed. Reg. at 25,978-25,979. The fact that the Department provided 30 days' notice before the effective date of the suspension and reinstatement, but did not attempt to argue that the agency had "good cause" to dispense with this procedural requirement under the separate good cause exception found in § 553(d)(3), further demonstrates that the Department did not rely upon the good cause exception in any aspect of the notice and comment proceedings. *See* 5 U.S.C. § 553(d)(3) (providing, in relevant part, that "the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . . as otherwise provided by the agency for good cause found and published with the rule").

exception, either explicitly or implicitly. Instead, the record plainly reflects that the Department concluded that the APA's notice and comment procedures were applicable, but that it had complied with such requirements. *Id.* at 25,978-25,979.

## V.

Having determined that the Department's reinstatement of the 1987 regulations qualified as "rule making" under the APA, and that the Department did not invoke the APA's good cause exception, we turn to consider the issue whether the agency action complied with the notice and comment provisions of the APA. We need not address this issue at length, because the record clearly demonstrates that the Department did not satisfy its notice and comment obligations.

The district court focused on the "content restriction" in its analysis whether the Department complied with the APA's notice and comment requirements. As recited above, the content restriction provided that "[c]omments concerning the substance or merits of the [2008 regulations] or the [1987 regulations] will not be considered." 74 Fed. Reg. at 11,408. The court noted that the Department "refused to consider comments that it received as to those rules' substance and merits." According to the court, such comments were "relevant and important" to the Department's stated basis for its decision to suspend the 2008 regulations, namely, the severe economic circumstances facing the country. The court further explained that the Department's refusal to consider such comments was a failure to "give interested persons an opportunity to participate in the rule making," and a "failure to consider important aspects of the problem."

The Farm Workers, however, argue that the 10-day comment period was reasonable, and was adequate to provide notice and the opportunity for public comment. They also point to the fact that 800 comments were received, contending that this volume of response indicates that the Department

provided adequate opportunity for comment. According to the Farm Workers, the Department adequately explained its action and "responded to the public's comments with reasoned explanations." Thus, the Farm Workers assert that the district court improperly attempted to craft additional procedural requirements, beyond those mandated by the APA, in concluding that the content restriction prevented the Department from receiving comments on matters "relevant and important" to the "rule making." We disagree with the Farm Workers' arguments.

The notice and comment provisions of the APA require, among other things, that the agency give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and that the agency shall explain its decision, "[a]fter consideration of the relevant matter presented." 5 U.S.C. § 553(b), (c). In addition, the Supreme Court has emphasized that agency action "normally" will be deemed arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. We likewise have explained that during notice and comment proceedings, the agency is obligated to identify and respond to relevant, significant issues raised during those proceedings. *S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 885-86 (4th Cir. 1983).

By the very terms of the 2009 Notice, the Department stated that it would not receive or consider comments that were not only "relevant and important," but were integral to the proposed agency action and the conditions that such action sought to alleviate. In the 2009 Notice, the Department stated that it proposed to suspend the 2008 regulations and reinstate the 1987 regulations, because of difficulties in operating the H-2A program under the 2008 regulations, including a lack of resources, inability to implement operations, and processing delays. 74 Fed. Reg. at 11,409. These reasons for the 2009 Suspension were significant, substantive matters, which raised questions whether the review process provided

in the 2008 regulations was more or less efficient than the review process provided in the 1987 regulations.

We therefore agree with the district court that, as a result of the Department's content restriction, the Department refused to receive comments on and to consider or explain "relevant and significant issues." *See* 5 U.S.C. § 553(b), (c); *Tindal*, 717 F.2d at 885. Moreover, the content restriction was so severe in scope, by preventing any discussion of the "substance or merits" of either set of regulations, that the opportunity for comment cannot be said to have been "a meaningful opportunity." *Prometheus Radio Project*, 652 F.3d at 450.

Our conclusion that the Department did not provide a meaningful opportunity for comment further is supported by the exceedingly short duration of the comment period. Although the APA has not prescribed a minimum number of days necessary to allow for adequate comment, based on the important interests underlying these requirements, *Chocolate Mfrs. Ass'n*, 755 F.2d at 1103, the instances actually warranting a 10-day comment period will be rare. Such instances are generally characterized by the presence of exigent circumstances in which agency action was required in a mere matter of days. *See, e.g.*, *Omnipoint Corp. v. FCC*, 78 F.3d 620, 629-30 (D.C. Cir. 1996) (upholding 15-day comment period given the "urgent necessity for rapid administrative action" evidenced by "congressional mandate [to act] without administrative or judicial delays" (citation omitted)); *Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1321 (8th Cir. 1981) (upholding 7-day comment period and invocation of the good cause exception, when agency needed to resolve expeditiously dispute among airlines about aircraft landing "time slots," or risk widespread flight disruption).

We also observe that when the Department earlier engaged in rule making related to the 2008 regulations, the agency received about 11,000 comments over a 60-day comment period. *See* 73 Fed. Reg. at 77,111; 73 Fed. Reg. at 16,243.

In this context, the 800 comments received over the 10-day comment period allowed here do not support the Farm Workers' argument that the Department provided adequate opportunity for comment.

Accordingly, because the Department did not provide a meaningful opportunity for comment, and did not solicit or receive relevant comments regarding the substance or merits of either set of regulations, we have no difficulty in concluding that the Department "ignored important aspects of the problem." *Kempthorne*, 473 F.3d at 103. Therefore, we hold that the Department's reinstatement of the 1987 regulations was arbitrary and capricious in that the Department's action did not follow procedures required by law. *See* 5 U.S.C. § 706(2); *see also Mack Trucks*, 682 F.3d 95-96 (vacating agency interim rule when good cause exception did not apply, and APA notice and comment procedures were not followed); *Buschmann*, 676 F.2d at 358 (same); *Kollett v. Harris*, 619 F.2d 134, 144-46 (1st Cir. 1980) (holding "invalid" "procedurally defective" interim regulations that were issued without notice and comment, and in the absence of good cause).

VI.

Under the terms of the 2009 Notice and Suspension, the Department also proposed that H-2A workers employed on Christmas tree farms be defined as "agricultural" workers for purposes of the H-2A program, but defined as "non-agricultural" workers under the FLSA. 74 Fed. Reg. at 25,982. As a result of this distinction, Christmas tree workers would be entitled to various benefits under the H-2A program, and overtime pay benefits under the FLSA. The Farm Workers contend that the district court improperly applied the APA's notice and comment requirements to this determination, which was merely interpretive in character and construed the term "agriculture," within the meaning of the FLSA. Thus, the Farm Workers contend that the 2009 Notice and Suspension lawfully returned Christmas tree farmers to a classifica-

tion they had enjoyed before our *N.C. Growers' Ass'n* decision. We disagree with the Farm Workers' arguments.

"Interpretative rules" are not subject to the APA's notice and comment requirements. 5 U.S.C. § 553(b)(A). However, interpretative rules only are entitled to deference as articulated in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See S. Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 829-30 (10th Cir. 2000); *Watkins v. Cantrell*, 736 F.2d 933, 943 (4th Cir. 1984). In our *N.C. Growers' Ass'n* decision, applying such *Skidmore* deference, we considered the Department's similar classification of Christmas tree workers under the FLSA. 377 F.3d at 353-54. And, in *N.C. Growers' Ass'n*, we concluded that the Department's interpretation of the FLSA lacked any statutory support and did not have "the power to persuade." *Id.* (citing *Skidmore*, 323 U.S. at 140).

We noted in *N.C. Growers' Ass'n* that the Department's interpretation was not the product of "notice and comment rulemaking," and thus "lack[ed] the thoroughness of such rules." 377 F.3d at 354. The interpretation of the FLSA set forth in the 2009 Suspension fares no better, because the 2009 Suspension likewise was not subject to notice and comment. Accordingly, we adhere to our decision reached in *N.C. Growers' Ass'n*.

## VII.

In sum, we hold that the Department's reinstatement of the 1987 regulations for the H-2A program qualified as "rule making" under the APA. We further hold that the Department did not invoke the "good cause" exception of the APA and, therefore, was required to satisfy the APA's notice and comment requirements. Because the Department did not comply with those statutory requirements, the Department's action was arbitrary and capricious, in that the Department failed to follow procedures required by law. Finally, we hold that the Department's action did not validly extend the FLSA's over-

time pay provisions to Christmas tree farmers, and we remain bound by our decision in *N.C. Growers' Ass'n*.

For these reasons, we affirm the district court's award of summary judgment to the NCGA.

*AFFIRMED*

WILKINSON, Circuit Judge, concurring:

The different sets of regulations at issue in this case obviously reflect a political back-and-forth between employers seeking to more easily hire foreign agricultural workers through the H-2A program and those representing domestic agricultural workers, whose wages and employment prospects could be adversely affected by guest workers from abroad. The 1987 regulations, 54 Fed. Reg. 28,037; 52 Fed. Reg. 20,496, embodied one set of priorities. The 2008 regulations, 73 Fed. Reg. 77,110, embodied another and very different pro-employer set of priorities. The 2009 Suspension, 74 Fed. Reg. 25,972, and 2010 regulations, 75 Fed. Reg. 6884, then signaled a return, in the main, to the earlier 1987 emphasis on worker wage protection.

There is nothing necessarily wrong with this sort of see-saw. No one expects agency views to be frozen in time or to be immune from electoral mandates that will predictably result in alterations and modifications of agency rules and regulations.

Changes in course, however, cannot be solely a matter of political winds and currents. The Administrative Procedure Act requires that the pivot from one administration's priorities to those of the next be accomplished with at least some fidelity to law and legal process. Otherwise, government becomes a matter of the whim and caprice of the bureaucracy, and regulated entities will have no assurance that business planning predicated on today's rules will not be arbitrarily upset tomor-

row. Thus, the APA contemplates what is essentially a hybrid of politics and law—change yes, but only with a measure of deliberation and, hopefully, some fair grounding in statutory text and evidence.

I readily concur in Judge Keenan's fine opinion because it demonstrates, as did the district court's decision, that the very rudiments of process were absent here. It quite defies belief that the 2009 Notice of Proposed Suspension of Rule deemed comments on the merits of the regulations to be suspended or the regulations to be reinstated out of bounds. *See* 74 Fed. Reg. 11,408. In other words, the very agency actions that would most affect those subject to the varying sets of regulations were ruled off limits to discussion.

This all risks giving the impression that the agency had already made up its mind and that the comment period was, at best, for show and provided only in an effort to do the minimum necessary to squeak by judicial review. The confusion was further compounded when the 2009 Notice invited comments on whether the Department should suspend the 2008 regulations, but then stated that comments concerning the "substance or merits" of those very same regulations "will not be considered." *Id.* How in the world was a prospective commenter to know what could and could not be commented on, or what the agency would or would not deem worthy of its attention? The situation was further worsened by the highly abbreviated comment period allowed for what was, in reality, a complicated matter involving widespread real-world impacts on the different participants in the agricultural community and the difficulties and problems involved with the various regulations' implementation.

It is not a matter of tying an agency's hands in the face of a fresh electoral mandate. After all, the Department was able to achieve its objectives with the 2010 regulations. To have approved the process at issue in this case, however, would have been to generate a blueprint for agency unaccountability,

at odds with the very idea that government at all levels is subject to the written law.